UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

ANDREW WONG, individually and on behalf of all
others similarly situated; KA PO WONG individually
and on behalf of all others similarly situated; ANNE
LOUIE individually and on behalf of all others
similarly situated; APRIL NG individually and on
behalf of all others similarly situated; and MILLIE SU
individually and on behalf of all others similarly
situated,

Case No. 25-cv-09634

**CLASS ACTION
COMPLAINT WITH
<u>JURY DEMAND</u>**

Plaintiffs,

v.

TD BANK GROUP and TD BANK, N.A.,

Defendants.

-----------------------------------------------------------------X

Plaintiffs, Andrew Wong, Ka Po Wong, Anne Louie April Ng, individually and on behalf

of all others similarly situated, by their undersigned counsel, Advocates for Justice, Chartered

Attorneys, as and for their Complaint, allege as follows:

## <u>NATURE OF THE CLAIM</u>

1.      This is a class action brought by Chinese and Chinese-American branch-level

employees of Defendants TD Bank Group and Defendant TD Bank, N.A. (collectively "TD Bank"

or "TD") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et

seq.* ("Title VII"), the New York State Human Rights Law, Executive Law § 296 *et seq.*

("NYSHRL"), and the New York City Human Rights Law, Administrative Code of the City of

New York § 9-107 *et seq.* ("NYCHRL"). Plaintiffs seek declaratory, injunctive and equitable

relief, as well as monetary damages, to redress the Defendants' willful and malicious violations of

the law.

**INTRODUCTION**

2.      TD Bank, N.A., according to its own description, "is a member of [Defendant] TD Bank Group and a subsidiary of The Toronto-Dominion Bank of Toronto, Canada, a top 10 financial services company in North America trading on the New York and Toronto stock exchanges."[1] It is "one of the 10 largest banks in the U.S," and "serves over 10 million retail, small business and commercial customers from Maine to Florida."[2] It reported earnings of $736,000,000 in 2024.

3.      TD Bank, N.A. operates 2,192 retail locations across North America,[3] with 58 locations in New York City alone including branch locations in several areas of the City with high concentrations of Chinese and Chinese American populations ("Chinatown"). Among others, TD Bank, N.A. operates Chinatown branch locations in Manhattan at 314 Grand Street ("Grand and Allen Chinatown Branch") and 155 Canal Street ("Canal Street Chinatown Branch"), in Queens at 56-50 Main Street ("South Flushing Chinatown Branch") and in Brooklyn at 1301 65th Street ("Dyker Heights Chinatown Branch") (collectively "NYC Chinatown Branches").

4.      TD Bank actively cultivated a customer base in NYC Chinatowns by staffing the NYC Chinatown Branches with Chinese and Chinese American employees to attract and retain Chinese-speaking customers from NYC Chinatowns. TD encouraged its Chinese and Chinese American employees to cultivate relationships with members of the Chinese community to secure their business. TD Bank also encouraged its Chinese and Chinese American employees to "bank with TD," to bolster TD's credibility in the Chinese community. In short, TD leveraged the

---

[1] https://www.td.com/us/en/about-us/investor-relations

[2] https://www.td.com/us/en/about-us

[3] TD Bank Group, *Annual Report 2024*, https://www.td.com/ca/en/about-td/for-investors/investor-relations/financial-information/financial-reports/annual-reports

national origin of its Chinese and Chinese American employees to foster trust in the Chinese community and build their business.

5.      TD's Chinese and Chinese American employees were then targeted by the bank because of their ethnicity and national origin. They were punished for crimes committed by other Chinese individuals—crimes they were not involved in by individuals they did not know. Their Chinese heritage, once used by TD Bank to garner trust in the Chinese community, now became a target for TD.

6.      TD Bank operated with criminally insufficient oversight for years allowing criminal enterprises to utilize the bank to launder money and fund illicit activity.[4] An investigation by the U.S. Government revealed that networks of Chinese money-brokers used by Mexican drug cartels laundered millions of dollars in proceeds from illegal activity through TD Bank, N.A.[5] On October 10, 2024, TD Bank, N.A. pled guilty to civil and criminal violations related to money laundering and violation of the Bank Secrecy Act ("BSA"). TD Bank agreed to pay $1.8 billion in penalties, enhance and remediate its anti-money laundering ("AML") compliance program, and retain an independent monitor as part of the plea agreement.[6]

7.      TD Bank's plea agreement came, upon information and belief, after several years of active cooperation with the authorities. In other words, TD Bank was aware that transaction by Chinese nationals had been flagged as problematic, and that the government blamed the bank's inadequate AML controls for allowing various Chinese criminal enterprises to conduct transactions through its branches.

---

[4] https://www.justice.gov/archives/opa/pr/td-bank-pleads-guilty-bank-secrecy-act-and-money-laundering-conspiracy-violations-18b

[5] https://www.wsj.com/articles/td-bank-probe-tied-to-laundering-of-illicit-fentanyl-profits-aae71243

[6] https://www.justice.gov/criminal/case/united-states-america-v-td-bank-na

8.     To placate investigators and give the appearance of robust AML procedures during the investigation, TD Bank began to enforce its AML policy in a way that intentionally targeted and disproportionately impacted the bank's Chinese and Chinese American employees. TD Bank constructed and maintained a system for investigating "suspicious" employee transactions that resulted in "robust enforcement"—if an employee was Chinese. The instigation, detail of investigation, exhaustive follow-up, deep dive into an employee's transaction history, disregard of employee's exculpatory evidence and disproportionate consequence (almost all investigated employees were terminated)—went far beyond the normal scope.

9.     The targeted Chinese and Chinese American employees provided proof that transactions questioned by TD were legitimate, yet each still suffered the most severe adverse employment action possible. They were terminated.

10.    More callously, the terminated Chinese and Chinese American were demarketed from TD Bank. TD closed their personal and business accounts, and, upon information and belief, barred them from banking with TD in the future. After using its Chinese and Chinese American employees to buttress the bank's reputation in the Chinese community, TD banned them as customers. Their Chinese national origin, once a marketing boon, became a black mark and basis for TD to sever any business relationship with them.

11.    TD Bank's AML policies, procedures and practices, to the extent they are facially neutral, have had adverse impact on Chinese and Chinese-American employees because they target cash transactions, even if those transactions are legitimate. Traditionally, Chinese families borrow money from relatives, friends, colleagues, and maybe private financial firms, rather than commercial banks or credit unions. It is also common for the elder members of a Chinese family

to lend or gift funds for large purchases, such as a house. This financial culture exists and is prevalent in the Chinese diaspora, including the Chinese-American community.

12. TD Bank also subjected Chinese and Chinese American employees to disparate treatment based on their national origin by, among other tactics, aggressively investigating any potential AML violations by employees working at the NYC Chinatown Branches, taking the drastic step of shuttering the Grand and Allen Chinatown Branch, the Dyker Heights Chinatown Branch and the South Flushing Chinatown Branch as part of the investigation, summoning employees to TD Bank, N.A.'s New York City headquarters, interviewing them in the presence of lawyers and corporate security, suspending them for weeks or months, then terminating the employees for unspecified violations of the Code of Conduct. TD, upon information and belief, did not take these drastic steps at any other branches.

13. In fact, many of the Chinese and Chinese American employees did not find out what TD Bank claimed they did until they filed an EEOC charge.

14. TD Bank has aggressively and disparately enforced AML policies against its Chinese and Chinese American employees and at its NYC Chinatown Branches because they are Chinese and unjustly and insincerely linked to the Chinese money brokers that used TD Bank, N.A. to launder millions of dollars gained from criminal activity.

## JURISDICTION

15. This Court's jurisdiction is invoked pursuant to 29 U.S.C. Section 1331, and 42 U.S. Code § 2000e–5.

16. This Court has supplemental and pendent jurisdiction pursuant to 28 U.S.C. § 1367(a) over the Plaintiff's state law claims arising under the New York State Executive Law

§296(1)(a) and the NYC Administrative Code, because the Plaintiff's federal and state claims derive from a common nucleus of operative facts and form part of the same case or controversy.

17.     This Court has venue over this action pursuant to 28 U.S.C. § 1391(b)(1) and (c), in that Defendants maintain offices and conduct business in this district and the actions about which Plaintiffs complain occurred within the Southern District of New York.

## PARTIES

18.     Plaintiffs, Andrew Wong, Ka Po Wong, Anne Louie, April Ng, and Millie Su are of Chinese national origin. They are citizens and residents of the State of New York and of the United States. At all relevant times, they were employees of TD Bank as that term is defined by Title VII, NYSHRL and NYCHRL.

19.     Defendant TD Bank Group is a multinational banking and financial services corporation headquartered in Toronto, Ontario. It is an employer as that term is defined by Title VII, NYSHRL and NYCHRL.

20.     TD Bank, N.A. is an American national bank and the United States subsidiary of TD Bank Group. It is an employer as that term is defined by Title VII, NYSHRL and NYCHRL.

## STATEMENT OF FACTS

21.     Upon information and belief, in or before 2021, the U.S. Department of Justice commenced an investigation into TD Bank's anti-money laundering practices and compliance with the Bank Secrecy Act (the "DOJ Investigation").

22.     Upon information and belief, the DOJ Investigation was instigated by federal criminal charges against Chinese national, Da Ying Sze, who went by "David," for coordinating the money-laundering scheme using TD Bank branches in New York City to deposit large amounts of cash then purchasing cashier's checks or wiring funds to numerous individuals.

23.     Plaintiffs became aware that TD Bank was the subject of the DOJ Investigation in or about late 2021 or early 2022, when TD announced plans to acquire a Memphis, Tennessee-based bank: First Horizon Corporation.

24.     Upon information and belief, in or about November 2022, TD became aware that it would not be able to acquire the necessary approvals from federal bank regulators, in part because of alleged deficiencies in its anti-money laundering ("AML") monitoring procedures.

25.     At about that same time, TD began closing the accounts of, or demarketing, a large number of Chinese and Chinese American customers, including customers of the NYC Chinatown Branches, without explanation.

26.     Employees at the Grand and Allen Chinatown Branch, where about 60% of the clients are Chinese or Chinese American, and the other NYC Chinatown Branches, received numerous emails every week informing them of the "demarketing" of those customers.

27.     Upon information and belief, beginning in 2022 and through 2023, TD Bank's AML group began closely investigating the personal transactions of Chinese and Chinese American employees who worked at branches serving Chinese and Chinese American communities, including the NYC Chinatown Branches.

28.     To the extent TD Bank's investigation of its Chinese and Chinese American employees was an effort to avert any regulatory accountability for AML laxity, TD Bank's efforts were a failure. On or about October 10, 2024, TD entered into a plea agreement with the U.S. Department of Justice and the U.S. Attorney's Office for the District of New Jersey. As part of that settlement agreement, and upon information and belief to mitigate penalties, TD admitted that criminal enterprises had been able to exploit the bank's systems to launder millions of dollars in

proceeds from illegal activity; TD promised to "assist in the prosecution of the criminals who leveraged the weaknesses in [TD's] AML program, including five of its store-level employees."[7]

29.    In the words of then-Attorney General Merrick B. Garland, "By making its services convenient for criminals, TD Bank became one."[8] According to Philip Sellinger, U.S. Attorney for the District of New Jersey, TD "allowed hundreds of millions of dollars from money laundering networks to flow through the bank, including for international drug traffickers" which included one network "that dumped piles of cash on the bank's counters and another that allegedly withdrew amounts from ATMs 40 to 50 times higher than the daily limit for personal accounts." *Id.*, at p.2.

30.    As a result of TD Bank's investigations of its Chinese and Chinese American employees in the NYC Chinatown Branches alone, more than 22 TD Bank employees were terminated or subject to adverse employment actions. All but one of the known terminated employees were Chinese or Chinese American, and at least one was terminated for a transaction with a Chinese American employee. None of the 22 terminated employees had piles of cash dumped on their desks. None withdrew cash from ATMs at huge multiples of permissible daily limits. None interacted with international drug traffickers. None were among or had anything to do with the five store-level employees mentioned in the 2024 plea agreement. None were ever targeted for criminal prosecution.

31.    Upon information and belief, TD did not conduct similar investigations into the flagged transactions of employees who are not Chinese or Chinese American, and did not conduct similar investigations at branches that are not in Chinatown.

---

[7] https://https://stories.td.com/us/en/article/td-bank-group-announces-resolution-of-aml-investigations), at p.3.

[8] https://www.justice.gov/archives/opa/pr/td-bank-pleads-guilty-bank-secrecy-act-and-money-laundering-conspiracy-violations-18b, at p.1

The EEOC Class Charge

32.     Andrew Wong ("A. Wong") is Chinese American and was an employee at the Grand and Allen Chinatown Branch. He was wrongly terminated by TD Bank for violating its Code of Conduct and Ethics by engaging in transactions that purportedly implicated TD Bank's AML policy.

33.     On or about March 1, 2024, Plaintiff A. Wong filed a charge with the EEOC individually and on behalf of those similarly situated alleging that they were wrongly terminated and TD Bank discriminated against them based on ethnicity or national origin. That charge was assigned number 520-2024-03463 ("Class Charge").

34.     Subsequently, 21 additional former TD Bank employees filed affidavits in support of A. Wong's Class Charge and in support of individual charges alleging TD discriminated against them based on ethnicity or national origin.

35.     The five Plaintiffs herein were issued Right to Sue letters by the EEOC and commenced this action.

36.     Plaintiffs herein were investigated and terminated because they are Chinese or Chinese American, because of stereotypes about Chinese or Chinese American, and/or because TD Bank's policy, practice, and procedure for evaluating transactions of its employees disparately impacts immigrant communities such as Chinese or Chinese Americans.

**Facts Specific to Individual Plaintiffs**

**Andrew Wong**

37.     Andrew Wong ("A. Wong") started working for TD Bank in 2013 as a part-time employee. He was promoted approximately five times until reaching the position of branch

9

manager at TD's branch located at 314 Grand St, New York, NY 10002 ("Grand Street branch"), where he managed a team of ten to eleven employees.

38.    A. Wong's career at TD Bank was decorated with accolades. Most recently, in 2022, he was awarded a CEO WOW! Leadership Award.

39.    Feedback from his superiors, both formal and informal, was positive, and he fostered and maintained a productive working relationship with his team and other colleagues.

40.    As stated above, TD Bank encouraged its employees to open personal accounts and use the other services offered by TD. As a result, A. Wong maintained three personal checking accounts with TD and one business account, which was used for the income and expenses of an investment property.

41.    On or about March 20, 2023, A. Wong was notified by his manager, Raffaele DiMaggio ("R. DiMaggio"), that TD was conducting a corporate audit of the Grand Street Branch.

42.    When the on-site audit was complete, R. DiMaggio instructed A. Wong's team that they did not have to report for work the next day. He instructed employees at the Grand and Allen Chinatown Branch to report to TD's New York headquarters at 1 Vanderbilt Avenue (1 Vanderbilt") at various times on March 21, 2023.[9]

43.    TD took the drastic step of replacing A. Wong's entire team at the Grand and Allen Branch for the day while the team was at 1 Vanderbilt.

44.    When he arrived at 1 Vanderbilt, A. Wong was seated near counsel engaged by TD Bank as he waited to be interviewed. No representatives from TD's Corporate department were

---

[9] One member of A. Wong's team, Ka Po Wong, was not in the U.S. at the time and reported to headquarters at a later date.

present. This led A. Wong to believe that TD was not conducting a corporate audit but a different type of investigation.

47.    A. Wong soon learned he was correct. He was escorted to an interview room. A TD attorney and a human resources ("HR") representative were present. Several members of corporate security and possibly upper management appeared virtually to observe the interview.

46.    The investigators asked only preliminary questions about A. Wong, his team, and customers of the Grand and Allen Chinatown Branch before questioning A. Wong about personal banking transactions.

47.    The investigators asked about

(a)    Zelle payments from some of his team members, which he explained were reimbursement for group meals that the team split equally;

(b)    a $5,000 gift from a family member to assist with the downpayment on an investment property purchased by A. Wong and his wife, and

(c)    rent payments from the tenants of that investment property.

48.    The investigators also asked A. Wong about a check that he had received from a friend over five years earlier who happened to be a TD employee and money that he had lent to a former employee. The latter transaction had already been reviewed by upper management and settled. A. Wong had been educated about the TD Code of Conduct and Ethics ("TD Code of Ethics"), and he had never again lent money to an employee.

49.    TD investigators were particularly interest in transactions involving funds transferred to A. Wong from Chinese or Chinese-American people. None of the flagged transactions violated AML regulations or the TD Code of Ethics with the exception of the already

11

resolved loan to A. Wong's former employee. However, the transactions reflected typical financial transactions common in the Chinese community.

50.     After A Wong filed the Class Charge, TD identified additional transactions it investigated. However, A. Wong does not recall being asked about those transactions during the investigation.

51.     At the conclusion of the interview, TD told A. Wong that he would be on paid leave for 10 days and told him to expect further instructions at the end of the 10-day period. He was told he should expect to go back to work.

52.     A. Wong's leave lasted several months until June 5, 2023.

53.     During those months of leave, A. Wong emailed TD several times requesting an update. He did not receive any substantive response.

54.     On or about April 11, 2023, A. Wong went to the Grand and Allen Chinatown Branch to pick up foreign currency that he had ordered for a vacation planned before the investigation. A. Wong was not allowed access to the branch until he scheduled a time to visit and pick up his money. It had not been previously communicated to A. Wong that he was banned from the branch for personal banking.

55.     It was humiliating. TD treated him like a criminal when he had done nothing wrong.

56.     A. Wong was terminated on June 5, 2023, for violating the TD Bank Code of Ethics based on transactions from his personal account.

57.     TD refused to tell A. Wong which transactions purportedly violated the Code of Ethics and refused to tell him which provisions of the Code of Ethics he had violated.

58.     TD demarketed all of A. Wong's accounts when he was terminated.

59.     TD also terminated seven members of A. Wong's team, all of whom are Chinese or Chinese-American, for unspecified violations of the Code of Ethics.

60.     After his termination, and the damage it caused to his reputation in the Chinese community, A. Wong was unable to return to banking. He is now a self-employed real estate sales person making a fraction of what he earned at TD.

61.     Because of the investigation, and his subsequent termination and demarketing, A. Wong has also suffered from extreme depression and stress that has damaged his relationship with his wife, his parents, and his friends. On or about August 20, 2025, the EEOC issued A. Wong a "Notice of Right to Sue."

**Ka Po Wong**

62.     Ka Po Wong ("K. Wong") was hired by TD on January 3, 2022 as a Teller 1. She was promoted to Teller 2 at the end of 2022 and promoted to assistant head teller at the Grand and Allen Chinatown Branch in February 2023.

63.     On March 21, 2023, K. Wong returned from vacation in Hong Kong, and when she sought to check her work schedule, she learned she had lost access to the TD Bank employee "app," while she was away.

64.     K. Wong then contacted her branch manager, A. Wong, to find out when she was scheduled to work. He notified her that the Grand and Allen Chinatown Branch was closed for an audit, and that she should not report for work.

65.     On March 25, 2023, K. Wong's regional manager contacted her and instructed her to go to appear for an investigatory interview at 1 Vanderbilt at 9 a.m. the next day.

66.     K. Wong reported as directed.

67.    When she arrived at 1 Vanderbilt, she was placed in an interview room with three other people: a TD Bank attorney, an assistant to the attorney, and a TD HR investigator. Two other people were on a telephone conference call.

68.    K. Wong asked if the interview was being recorded, and the attorney said that it was not. Accordingly, K. Wong assumed that the interview was not very important.

69.    First, the attorney asked K. Wong generally about each of her team members, their relationship, and the work they did.

70.    Then, the attorney questioned K. Wong about specific customers and business accounts, but none of them were familiar to her.

71.    Next, the attorney also asked K. Wong about personal banking transactions with her parents.

72.    Between March and April of 2022, K. Wong's parents gave her four separate cash loans totaling $25,000, to help her buy a car.

73.    K. Wong deposited the loans into her TD Bank savings account.

74.    Unable to decide which car to buy, K. Wong eventually transferred the money into her checking account, wrote a check for $25,000, and put that into her Discover savings account, which paid higher interest than her TD savings account.

75.    The investigator asked K. Wong if she was trying to avoid filing currency transaction reports, which must be filed whenever $8,000 or more in cash is deposited into a bank account. K. Wong was not. She was making timely deposits as her parents had given her money.

76.    K. Wong apparently did not make it clear to the investigators that the money from her parents was a loan.

77.     The investigators also questioned K. Wong about her parents' jobs - her father is retired, and her mother is a home healthcare worker – and how her mother is paid. The investigators suggested that her parents could not have saved money to lend to her. The $25,000 was money that K. Wong's parents had worked for and saved from their salaries.

78.     The investigators then asked K. Wong about Zelle transactions with her work friends. When they went out for holidays and to celebrate such things as promotions, her work friends each contributed their share via Zelle.

79.     The investigators told K. Wong that she could not go back to work until the investigation was completed. She was put on paid suspension.

80.     K. Wong was terminated on April 24, 2023, in a telephone call and an email. She was told that she was terminated for violating TD Code of Ethics.

81.     K. Wong was pregnant when she was terminated.

82.     It was extremely stressful.

83.     After her employment ended, TD Bank's HR department required time to process and submit her termination notification to the insurance provider, Aetna.

84.     Following receipt of this notification, Aetna required additional time to process and issue the official termination documents necessary for K. Wong to enroll in a new insurance plan.

85.     Due to these prolonged administrative procedures, K. Wong was unable to switch insurance plans promptly and missed the deadline to enroll in new coverage.

86.     Moreover, on the very day of her termination—April 24—Aetna terminated my insurance coverage immediately without any transitional period.

87.     Losing her Aetna coverage abruptly meant K. Wong was unable to continue seeing her obstetrician or maintain her existing medical care. This abrupt disruption had a profound and detrimental impact on her healthcare.

88.     Tragically, on June 4, K. Wong suffered a miscarriage. Following this, she was diagnosed with depression.

89.     These devastating outcomes are directly linked to the immediate termination of K. Wong's health insurance and the subsequent interruption in her medical care.

90.     Also, as a result of her termination from TD Bank and the damage it caused to her reputation in the Chinese community, K. Wong has been unable to find comparable employment. At the end of July, 2023, K. Wong got a job working part time at a bubble tea store. In September, 2023, she started working full time as a home healthcare worker. She is making far less than she did at TD.

91.     As a result of her termination, K. Wong has been extremely distressed and depressed.

92.     On or about February 23, 2024, K. Wong filed and affidavit in support of the Class Charge and in support of an individual charge of discrimination with the EEOC.

93.     Her individual charge was assigned Charge No. 520-2024-03468.

94.     On or about August 26, 2025, EEOC issued K. Wong a Notice of Right to Sue.

**April Ng**

95.     April Ng was hired by TD Bank as a customer service representative in 2008. In 2013, she transferred positions to an associate in commercial lending for Staten Island and Brooklyn Heights. By May 15, 2023, April Ng was a Senior Commercial Sales Associate. T

16

96.     On or about May 15, 2023, TD Bank's marketing president called and instructed her to report to 1 Vanderbilt, the next morning, May 16.

97.     When she reported to 1 Vanderbilt on May 16, 2023, April Ng was interviewed by an attorney, a paralegal, and a TD HR investigator. Four TD corporate security employees attended the interview by Zoom, and additional TD employees also may have been on Zoom.

98.     The investigators asked April Ng about her relationship with Paula Li ("Li").

99.     They questioned April Ng about a transaction in 2017 when April Ng was on maternity leave for the Chinese New Year. It fell on January 28, 2017, and April Ng wanted $500 in new bills to give out as New Year gifts, a tradition in the Chinese community. Li lived nearby so April Ng asked Li to exchange older currency new bills. She sent Li $500 to pay for the new bills.

100.    The investigators also asked April Ng if she knew anything about a Chinese company that they said was laundering money. She did not know the company. She heard later that TD believed that a team at a TD branch were looking the other way when the Chinese company laundered money at the bank. April Ng knew nothing about this.

101.    The investigators went through ten years of April Ng's transactions and asked her about many of them. She answered the questions as fully as she could, but she did not remember some of the transactions.

102.    Many of the questions focused on transactions in 2022 with Gabriella DiMaggio ("DiMaggio"), April Ng's best friend. April Ng and G. DiMaggio were so close that they were more like family -- like sisters -- than mere friends.

17

103. In October 2022, April Ng bought a house near DiMaggio. She needed money to close, because the sale of her old house took place about five months after closing on her new house.

104. DiMaggio lent April Ng $50,000, as a short-term loan to cover closing costs. April Ng paid back $20,000 in November 2022, because the closing cost less than she had originally anticipated. April Ng paid back the remaining $30,000 in April, 2023, after she sold her old house.

105. The investigators asked if DiMaggio and April Ng had signed any kind of agreement. They had not. The investigators asked April Ng if the transaction was a loan or a gift. Because she was nervous and intimidated, April Ng told them it was a gift. She does not know why she said that except that it was a kindness for a friend to loan $50,000 without charging interest. She later realized that the money was more accurately a loan. On information and belief, when the investigators interviewed DiMaggio, DiMaggio explained the funds were a loan.

106. The three transactions with DiMaggio were all between TD accounts. April Ng had a paper trail. She was not trying to hide the transactions.

107. The investigators questioned how April Ng could afford to buy a house on her income and her husband's. She explained that she and her husband have been working and saving all their lives., and she April Ng she had to sell her old house to afford the new house. She also explained that, as is typical in Chinese communities, family members and close friends gave them money to help them.

108. April Ng provided the investigators at the interview with all the information about the funds for the purchase of the house. The funds were in the form of checks and transfers from her Discover account, where she kept her savings, a check from her husband, and a check from her sister. Nothing was done in cash.

109.    After the interview, April Ng provided TD with the closing statement.

110.    The interviewers told April Ng that it was against policy to have any financial ties with a coworker. April Ng explained that she and DiMaggio are close friends.

111.    After April Ng was questioned for about two hours, she was told to return to work. HR told her that they would contact her in ten days.

112.    Upon information and belief, TD continued to investigate April Ng's accounts during this time.

113.    They subsequently questioned her about another transaction with DiMaggio in 2021 or 2022. At the time, DiMaggio's 2-year-old son was being treated for cancer. DiMaggio needed $6,000 or $8,000 transferred from her account to her son's medical provider for treatment. DiMaggio, who was not working at the time, asked for April Ng's help to make the transfer.

114.    April Ng explained that, after checking with her branch manager to make sure it was permissible, she used a demand debit ticket, which is what the bank uses when a customer is not present for a transaction, and used a teller to deposit the funds into the medical provider's account.

115.    On the evening of July 5, 2023, April Ng was told not to go in to work the next day and expect a call at 9:30 a.m.

116.    On July 6, 2023, April Ng was told she was being terminated for three reasons: (1) for "forging" DiMaggio's name on a demand debit ticket even though April Ng had checked to make sure doing so would be permissible and was the standard practice when a customer was not physically present; (2) for having financial ties with a coworker; and (3) for using TD Bank's system to look at DiMaggio's account, her husband's account, and her own account to get account numbers for deposits.

117. After terminating April Ng, TD immediately demarketed her and her husband. It took weeks for them to get their money from TD. Several checks bounced as a result. They also had late fees and return fees due to the rejection of several automatic payments.

118. Between the first interview and the date of her termination, April Ng could not sleep and cried all the time. For two months during that time, she was sent back to work and then called in for further investigations. April Ng still has nightmares about the investigations.

119. After her termination, April Ng was unemployed until October 2, 2023, when she started a job at Chase Manhattan as a business relationship manager. The position is substantially less desirable because it is essentially telemarketing and she must cold-call customers and to get them to apply for credit cards. She commutes three hours per day. Her TD job was close to her home. Also, she is not proud of the work that she is doing, as she had been at TD.

120. April Ng is still very upset. The entire experience has been extremely painful. TD did not warn her that the transactions at issue violated the TD Code of Ethics or that engaging in the transactions might lead to dismissal. Instead, the bank treated April Ng like a criminal.

121. On or about March 19, 2024, April Ng filed and affidavit in support of the Class Charge and in support of an individual charge of discrimination with the EEOC.

122. Her individual charge was assigned Charge No. 520-2024-05641.

123. On or about August 26, 2025, EEOC issued April Ng a Notice of Right to Sue.

**Millie Su**

124. Millie Su ("Su") started working for TD as a part-time teller in Brooklyn Heights in April 2010. She was promoted to Teller 2, and then to Assistant Head Teller.

125. In May of 2014, Su became the head teller in Prospect Park. In 2016, she became head teller at the Dyker Heights Chinatown Branch.

126.    In June of 2019, she was promoted to store supervisor at Gravesend.

127.    In November of 2022, a Global Security investigator and an HR officer called her at Gravesend branch.

128.    She was interviewed via telephone for an hour to an hour and a half.

129.    First, the interviewers told Su they were conducting a general internal investigation of all employees at the location. However, the questions they asked were very accusatory, and they were impatient whenever Su asked any questions.

130.    The investigators went through all of Su's transactions from about 2013 until the most current.

131.    They asked about friends that Su had who still worked at or once worked at TD, including Chung Pow ("Chung") and Tea Sinana ("Sinana").

132.    The investigators wanted to know details about Su's Zelle transactions with Chung and Huang. The three women bought gifts together and then paid each other their shares via Zelle. They also went out to dinner together. One person paid, and the others paid their shares of the costs via Zelle.

133.    In June of 2019, after Chung had left TD, Su moved in with Chung and her mother. Su's rent was $1,480 a month, which she paid via Zelle.

134.    The investigators asked Su about her TD accounts. In 2010, she opened a checking account. Her pay went into that account by direct deposit. The investigators asked about a second account, which Su opened to help manage the bills of a house that her father owned. The rent money, which was paid in cash, went into that account. The expenses were paid from the account via electronic payments.

135. The investigators asked about cash deposits that Su made so that her relatives could get new currency to give as gifts. It is the Chinese custom to give money in red envelopes as blessings in the Chinese New Year, for birthdays, weddings, childbirths, and to help with travel plans. It is also a Chinese custom to give money in white envelopes to the family member of someone who has passed away. Over the years, Su deposited many thousands of dollars to get fresh bills for these gifts. Whenever there were cash deposits, she wrote down on the deposit slips who it was from and who it was for to have a paper trail.

136. Su's relatives had jobs that could account for the money they gave her. She kept notes about all of her transactions. Thus, Su was able to tell the interviewers the names of all the people who received cash gifts from her aunts and uncles.

137. The investigators wanted the names of Su's aunts and uncles. Her mother had eight siblings and her father had six siblings. Su addressed them as "uncle" and "aunt," not by name.

138. The investigators asked about family members to whom Su had written checks. Family members contributed about $5,000 in cash for Gerry Huang to buy a house. They gave the money to Su, and she wrote a check to Gerry Huang. Su did the same when Gordon, her godfather and her father's childhood friend, was buying a house. Family members contributed about $15,000 in cash, which Su deposited into her account. Su added another $5,000, and wrote a check for about $20,000.

139. The investigators asked if Su had ownership interest in any of the houses. She did not. The only ownership interest that Su has is as part owner of the house her father owns with two others. That is the house for which she does financial management using her second TD checking account. Her paternal grandmother lives there, and Su has a room that she uses when her grandmother needs help. The back apartment is rented to Su's uncle, who pays his rent in cash.

22

140. The investigators also asked about smaller transactions with friends that they claimed were inappropriate.

141. The investigators told Su that, because TD is a financial institution, lending money is an interference with TDs service.

142. The investigators also asked Su about her brother, Biron Su ("Biron"). Biron had deposited two Northfield bank checks for $6,000 or $8,000 into his TD account. The investigators asked where the checks were from. Su explained that Biron had been working as a part-time stock boy for many years. He had been saving, and he decided to switch from Northfield Bank to TD.

143. The interviewers gave Su examples of financial transactions and asked her what those transactions were. The answer to the question the interviewers asked was that the transactions were examples of money laundering.

144. Su is very honest and loyal. She believed in TD and trusted the bank completely. It hurts her so much for them to call her a criminal and interrogate her to the point where her personal life was picked apart. They made Su feel ashamed. She was traumatized.

145. The investigators questioned Su four or five times. After the first or second, Su had a panic or anxiety attack while walking to work. Her heart was pounding. Her head was light. She called her store manager and said that she could not take it anymore and was quitting that day. Her manager told her that TD needed her and that everything was going to be okay.

146. The interviewers told Su that she could not discuss the interviews with anyone.

147. Su was terminated on November 14, 2022, by Adam Alshawish, the regional manager; Joanie Galestro, the regional operational manager; store manager Alexandra Kolvayova, and the HR interrogator.

148.    Lending money was one of the reasons given for the termination. They mentioned ethics code violations.

149.    The regional manager escorted Su out.

150.    TD closed Su's accounts and the accounts of all her family members. After the accounts were closed, TD sent Su a letter saying that TD would be closing the accounts.

151.    Because of the damage to her reputation in the banking community, Su is afraid to apply to another bank for work.

152.    Su took classes on preparing for jobs, which are provided by New York State Unemployment. That enabled her to get unemployment insurance. But she felt lost due to her experience at TD. Su had to take a full year off.

153.    On or about March 11, 2024, Su filed an affidavit in support of the Class Charge and in support of an individual charge of discrimination with the EEOC.

154.    Her individual charge was assigned Charge No. 520-2024-06502.

155.    Su has asked EEOC to issue a Notice of Right to Sue.

**Anne Louie**

156.    Anne Louie ("Louie") started at TD as a service manager in 2014 at the branch located at Canal Street Chinatown Branch. In 2023, she was promoted vice president and store manager.

157.    On May 10, 2023, Louie was instructed to report to TD's corporate office at 1 Vanderbilt, where she met with a TD attorney, an HR manager, a stenographer, and four employees from TD's back office who participated on Zoom.

158. The attorney stated that Louie was there to assist with an ongoing investigation in connection with the TD branch located at Grand and Allen Chinatown Branch. He proceeded to question Louie, as did the HR representative.

159. The investigators asked Louie about transactions in her TD accounts going back to 2014, when she started working at TD. Louie had several TD -- her own account, a joint account with her husband, and joint accounts with her sisters, who are older and asked to add Louie to their accounts to assist them paying bills and other matters.

160. The investigators asked Louie to explain a recent $50,000 check that she wrote to her son to help him purchase a home in New Jersey. The money Louie gave to her son was from years of hard-earned savings and had been in the accounts for many years.

161. They also asked Louie to explain her credit card activities, particularly charges at luxury stores such as Louis Vuitton, Neiman Marcus, and Burberry.

162. The investigators seemed particularly concerned with her transactions and her husband's transactions for around $3,000 to $4,000, made because they share normal household expenses. Louie was able to explain the transactions to the investigators, but, on information and belief, her explanations were ignored and deemed to be suspicious.

163. Louie returned to work after the interview and continued to work at TD without incident until June 5, 2023. Her manager called and asked her to meet him the next day at the TD branch at 2 Wall Street. When Louie arrived, she met with her manager in person and with an HR representative who was on her manager's cell phone. Very shortly into the meeting, she was told that, due to violations of TD's Code of Conduct that were revealed through TD's investigation, she was terminated effective immediately. They further stated that there was no need to provide any rebuttal. Their decision was final.

164.    It was apparent to Louie that TD intended to terminate her regardless of her stellar work performance over the course of 8 years and despite the fact that she had been recognized with annual CEO awards in 2021 and 2022 and a very distinctive Vision in Action award in 2021, which are given to only a handful of top performers throughout TD each year.

165.    After the meeting, Louie's manager told her that he had no knowledge of why TD had targeted her for investigation and said, of the investigation of numerous Chinese and Chinese American employees, that "this is not what he had signed up for."

166.    After being terminated, Louie immediately started looking for a new job. It was difficult because the Chinese community in New York City is small. There is no doubt that TD's actions had damaged her reputation and impacted her livelihood.

167.    Louie is extremely upset and distressed by TD's actions. She had supported management for all the years that she worked for TD. She went above and beyond to support TD's initiatives throughout the peak of the pandemic. However, senior management did not support her in return and, I believe, used Chinese employees as a scapegoat for the failure of their merger with First Horizon Bank. Louie wants to be compensated for the anxiety and stress TD caused her and for the damage to her reputation, and she wants to be cleared of any wrongdoing. The Chinese community is small, and TD has damaged her reputation among clients and future employers.

168.    Louie was unemployed for 5 months. She started a job at a very small Asian Community bank after being turned down on several jobs. Every recruiter in the Asian community had expressed concerns about applicants with her employment history working with TD. With that being said, she needed to move on with her career. Moreover, she had household expenses. Thus, she had no choice but to accept the role of both branch manager and business development officer for the region with Abacus Federal Savings community bank. Louie was forced to accept a $40,000

salary reduction when she accepted the position. Louie later found out the role she was to play there was not what the bank described during the interview. Besides the lower salary, there was no support from senior management, no training, and the work environment was abusive, to say the least. To salvage what is left of her reputation in this industry, Louie was recently forced to resign.

## CLASS ACTION ALLEGATIONS

169.    Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Plaintiffs seek to represent a certified Plaintiff class consisting of Chinese and Chinese American branch-level employees in the Unites States who have been subjected to investigation and termination for unspecific violations of TD Banks Code of Conduct and Ethics from 2022 through the present.

170.    The members of the Class are so numerous as to render joinder impracticable: as of 2025 TD Bank operated over 1,100 retail branches is the U.S. and has over 30,000 employees, and, upon information and belief, over 3,000 of those employees are Asian and almost 2,000 are Chinese speaking. Many of the employees terminated from TD Bank, N.A. from 2022 through the present are Chinese or Chinese American. Upon information and belief, at least over 40 TD Bank, N.A. employees in the New York City metropolitan area alone were impacted by TD Bank's disparate enforcement of its AML policy, procedure and practice, and would be members of the class.

171.    Upon information and belief, many Class members do not bring individual claims for fear of damage to their reputation in the Chinese and Chinese American communities where they live and work.

172.    The claims of the Plaintiffs herein are typical of the claims of the Class members in that the Class members suffered and adverse employment action as a result of TD Bank's discriminatory AML policy and discriminatory enforcement of its AML policy.

27

173.    There are questions of law and fact which are common to the Class including, but not limited to:

    a.    Whether TD Bank's AML policies, procedures and practices have been enforced in discriminatory manner against Class members since at least 2021;

    b.    Whether TD Bank's AML policies, procedures and practices have an adverse impact upon the Class, and if so, whether this impact is justified by business necessity;

    c.    Whether TD Bank's policy, procedure or practice of granting investigators discretion in detail of investigation, exhaustive follow-up, deep dive into an employee's transaction history, disregard of employee's exculpatory evidence and disproportionate consequence negatively affects Class members;

    d.    Whether TD Bank has a policy, procedure or practice of disproportionately investigating transactions by Class members; and

    e.    Whether TD Banks has a policy, procedure or practice of disproportionately terminating Class members after investigation

174.    The named Plaintiff will adequately represent the interest of the Class members as there are no conflicts of interest and are able to pursue litigation on behalf of the Class.

**AS AND FOR A FIRST
<u>CAUSE OF ACTION</u>
(For Violations of Title VII of the Civil Rights Act of 1964)**

175.    Plaintiffs repeat and reallege each and every allegation made in the foregoing paragraphs as if fully set forth herein.

176.    Plaintiffs belong to a protected class based on their national origin and/or ethnicity as Chinese and Chinese-American.

177.    By acting as aforedescribed, Defendants have discriminated against Plaintiffs.

178.    As a direct and proximate result, Plaintiffs have suffered injuries as set forth above.

179.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed as legally permissible.

180.    Plaintiff and other members of the Class have no adequate remedy at law and will suffer serious and irreparable harm to their rights under Title VII unless Defendants are enjoined from enforcing AML policies, procedures and practices as set forth above.

181.    The Plaintiff Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory and injunctive relief appropriate,

**AS AND FOR A SECOND**
**CAUSE OF ACTION**
**(For Violations of the New York State Human Rights Law)**

182.    Plaintiffs repeat and reallege each and every allegation made in the foregoing paragraphs as if fully set forth herein.

183.    Defendants conduct as described above had discriminated against Plaintiffs due to their national origin and/or ethnicity in violation of the New York State Human Rights Law.

184.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered injuries and damages as set forth above.

**AS AND FOR A THIRD**
**CAUSE OF ACTION**
**(For Violations of the New York State Human Rights Law)**

185.    Plaintiffs repeat and reallege each and every allegation made in the foregoing paragraphs as if fully set forth herein in violation of the New York City Human Rights Law.

186.    Defendants conduct as described above had discriminated against Plaintiffs due to their national origin and/or ethnicity.

187.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered injuries and damages as set forth above

29

## JURY DEMAND

188.    Plaintiffs demand a trial by jury on each and every claim to which they are legally entitled to a jury.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs and the Class pray for relief as follows:

(a)    Certification of the case as a class action on behalf of the proposed Class;

(b)    Designation of Plaintiffs as the Class representatives;

(c)    Designation of Plaintiffs' counsel of record as Class Counsel;

(d)    A declaratory judgment that the practices complained of herein are unlawful ad violate 42 U.S.C. section 2000e, *et seq.*, New York State Human Rights Law and New York City Human Rights Laws;

(e)    An injunction against TD Bank Group and TD Bank, N.A., and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them from engaging in policies, patterns, and/or practices that discriminate against Plaintiffs or the Class because of their gender or participation in this lawsuit;

(f)    An order returning Plaintiffs and Class Members to their rightful positions at TD Bank, N.A., or, in lieu of reinstatement, an order for front pay and benefits;

(g)    Back pay (including interest and benefits) for the Plaintiffs and Class Members;

(h)    All damages sustained as a result of TD Bank Group and TD Bank, N.A.'s conduct, including damages for emotional distress, humiliation, embarrassment, and anguish;

(i)    Exemplary and punitive damages in an amount commensurate with TD Bank Group and TD Bank, N.A.'s ability to pay and to deter future unlawful conduct;

(j)     Costs incurred herein, including reasonable attorney's fees to the extent allowable by law;

(k)     Prejudgment and post judgment interest, as provided by law, and

(l)     Such other and further relief as this Court deems just and proper.

Dated: New York, New York
      November 18, 2025

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
*Attorneys for Plaintiffs*

By:_____*Arthur Z. Schwartz*_____
      Arthur Z. Schwartz

By:_____*Laine Armstrong*_____
      Laine Armstrong

225 Broadway, Suite 225
New York, New York 10007
(212) 285-1400
Email: aschwartz@afjlaw.com
      laine@advocaesny.com

31